Good morning, Your Honors, Niels Frenzen for Petitioner James Daniel. May I proceed, Your Honor? Yes, please. This is a case where the immigration judge, considering Mr. Daniel's asylum application, basically engaged in an exercise of cherry-picking. The immigration judge engaged in cherry-picking in regard to all- Is that a constitutional violation? It is, Your Honor. What it violates is, what I'm getting to is, perhaps I shouldn't have chosen those words, but what I'm getting to is the fact that the immigration judge's factual findings, finding that Mr. Daniel did not meet his burdens of proof for asylum and withholding, are not supported by substantial evidence in the record. By my count, the immigration judge ignored at least 19 documents that were submitted into the record. The judge focused on two documents, the 2001 State Department country report pertaining to Sudan and another magazine article. Relying on the 2001 State Department report, the judge concluded that Christians in the south of Sudan worshipped freely and concluded that the State Department report supported the finding that there were only episodic incidents of violence directed at Christians in the south of Sudan. If the immigration judge had considered the full 2001 State Department report, the judge should have also made findings that the State Department was reporting that supporters and suspected supporters of the SPLM and the SPLA, the Sudanese People's Liberation Movement and People's Liberation Army, were killed. The State Department reported that Petitioner's father and two older brothers were associated with and were killed as a result of their association, or Respondent, excuse me, Petitioner believes his father and brothers were killed as a result of their association with the People's Liberation Army. The State Department reported that suspected civilian supporters of the SPLA and SPLM were being killed by the government at the time of the hearing in 2001. So would you argue in the face of this evidence that it was wrong for the IJ not to infer by the fact of familial association that your client would not have been considered or would have been considered as a SPLM supporter because of what his brothers and his father had done in the past? I think it is a valid point that the government makes, and I believe the immigration judge noted this, that Petitioner Daniel does not know well the circumstances of his father and his older brother's deaths. He was 15 or 16 years old at the time this happened. He was living in Khartoum in the capital of the Sudan when he was taken out of the country in 1985. So this is old information. So I would say what the immigration judge did wrong here, he should have taken that into consideration. But I think the primary source of evidence indicating that the Petitioner is in danger if he were returned to Sudan, including whether or not he was returned to this, what the immigration judge, I believe, falsely characterized as a safe haven, as an Eden, if you will, in southern Sudan for Christians. But weren't you – I'm sorry. Maybe I misunderstood your argument. I heard you urging us to conclude that by virtue of his familial ties to the SPLM, that he would be viewed as a civilian supporter of the SPLM and therefore subject to greater danger of attack by the government in the south of Sudan. That is my argument. I think the record supports – That is, again, not your principle. No, not at all. My principle argument – It's an incidental argument to support your principle. Thank you, Judge Reinhart. Why don't you make your principle argument? My principle argument is that because the Petitioner is a black Christian and because the State Department has described the situation of black Christians in the south of Sudan as one of the worst human rights situation in the world and that the Sudanese government's most brutal treatment is reserved for black Christians, the immigration judge ignored that evidence. Those particular findings by the U.S. Department of State are not in the 2001 State Department report. They're instead in the Department of State Country Profile for Asylum Seekers from Sudan, a report that the State Department prepares specifically to facilitate immigration judges and their adjudication of asylum applications from countries that produce large numbers of asylum seekers. So the immigration judge – the government appropriately, correctly points out in its papers that the State – that this Court has recognized that the State Department is the authoritative source for assessing country conditions and human rights violations in countries from which individuals are seeking asylum. The judge cherry-picked, to go back to that phrase, from the 2001 country condition report, and the judge totally ignored the State Department's country profile for asylum claims from the Sudan. Sotomayor, if the – hypothetically, if the south were an Eden for black Christians, but the north was a legitimate fear of persecution, could the judge have said, oh, well, he can go back and go to the south, or does that require a further analysis about the reasonableness of relocation to the south? I think the immigration judge actually did do that, in addition to ignoring the – what we believe is the substantial evidence in the record that compels an alternate factual finding. But the immigration judge did specifically conclude that Mr. Daniel could return safely to the south. And under this Court's precedent in Singh v. Ilkert and various other cases, when the entity that an asylum seeker fears is the government, when the government is the persecutor, there is a presumption, a rebuttable presumption, but a presumption that the government can reach that individual anywhere in the country. And even if that presumption can be overcome, this Court also has said it has to be shown that it would be reasonable to expect the asylum seeker to go to that safe haven in that particular area of the country. And we think the immigration judge did not make any findings about the reasonableness of relocation to the south of Sudan. The immigration judge determined it was safe for Daniel to go to the south, but he did not consider – again, this goes back to the substantial evidence argument that I'm making – he didn't consider, I think, the State Department and other human rights documentation in the record indicating that it is not safe for him. Additionally, even if we put aside – even if it is hypothetically a safe haven, is it reasonable to expect Daniel to go back to a town where he lived between the age of – shortly after his birth and five years of age when his mother and surviving siblings have fled the country, fled the country sometime in the 1980s, and he has no close surviving relatives left in the south of Sudan? I don't think the records would – the record in any way supports the finding that it would be reasonable for him to relocate to the south of Sudan. Is he in custody? He is not, no. Unfortunately, he is not in custody. For a little over two minutes, would you like to say a word for rebuttal? Yes, I would, Your Honor. Thank you. May it please the Court, and I'll ask to leave the floor for Respondent Gonzalez. Good morning again. Hi. Mr. Frenzen has made three fatal errors in his argument. One, the rebuttable presumption of relocate – reasonableness of relocation arises only when there's past persecution. Even Mr. Frenzen doesn't say that this alien was persecuted in the past. He left his hometown when he was five. He's had no connection with his family. Whatever happened to his father and brothers, tragic as it may have been, happened 30 years ago, and has no connection with him since he's – he has established no connection with the persecutory ground on the death of his father and brothers 30 years ago, and there's no nexus for him. And personal persecution is required to shift the burden, or past persecution of family? Well, we have to have – well, he has to have a nexus with the family, and he hasn't established that. He has had no – I mean, he had left home when he was five years old, and he doesn't know for a fact that his brother and fathers died as – because of persecutory acts. So there's his – But past persecution of the father and brothers would suffice. He doesn't need to show past persecution of himself personally in order to shift the burden. Well, it would suffice if there were a nexus. He hasn't established that nexus. A stronger nexus than it being his father and brother. Well, he had left home five years before, and he was not politically active, and his brothers and father were politically active. His father – his uncle had custody of him in another town. There's no indication that there was any tie between them. So is your argument, because he was five, he didn't – he can't know what happened to his brothers and his father. Therefore, the IJ was not compelled to conclude that they themselves were the victim of persecution. And even then, he can't show a nexus because of the fact that he was gone. Well, there's that, but he was ten because he'd been gone since he was five. This was all rumor. It was a time of crisis. It continues to be a time of crisis. But he's not arguing that this was past persecution. You know, your brief doesn't take the position you're taking now. You say in the brief, if an asylum applicant establishes a well-founded fear of future persecution at the hands of the government, a rebuttable presumption arises that the threat exists nationwide and, therefore, that internal relocation is unreasonable. That's quoting Milconian. However, the government can rebut this presumption by setting forth evidence, and then you go on to say that it did. Well, I – That's quite the opposite of what you're telling us this morning. I do apologize for that. I think it was a mischaracter – For this morning's argument? No, for the argument in the brief. I think it was a mischaracterization. But in any event, under either reading of Milconian or the statute, the fact is he has no well-founded fear of persecution. He has – Future? Future. Okay. Well, that's a different thing from past. And that's clearly established here that he has a generalized fear of not returning. As Mr. Frenzen said, he has no friends or family living there, but that's not a basis for a grant of asylum, that you don't know anyone there. You have to prove through evidence which compels no other conclusion that you will be persecuted on account of the statutorily protected ground. So you really believe that with what's going on in Sudan at the moment, with the genocide going on, what's going on in Darfur, that the government's position is we ought to be sending Christians back to a government that persecutes them? I don't think – Because there may be an island somewhere where at the moment they're in control, although the government, if it succeeds, will take over there also? Well, if the government believes that there is – it is in such a state of turmoil that everyone is at risk, the answer is not asylum, but temporary protected status. Otherwise, everyone – and then you get into, I think, Rustomian and Martina's – no, Martina Serrano's – Martina Romero, that if you're going to give persecution to everyone on either side of a war-torn country, then there's no basis for asylum. Everyone gets asylum. So there has to be some individualized risk, and there is none here. If the government decides, the Attorney General decides that it's not safe for people to return there, then the proper remedy is not a grant of asylum, which becomes eventually lawful permanent residence and permanent residence in the United States, but temporary protected status, which means things are so bad there that we're going to give you safe haven here until things clear up. And is that something the IJ here could have done? No, no, no, no. It's an agency decision. It's done by the Attorney General. And the last time we did it was, what, Nicaragua? Oh, no. There are current TPS countries now. I don't have a list of them, but – Okay. But Nicaragua was one of them, wasn't it? Oh, yes. And Honduras is another one because of the hurricane damage. So it's not necessarily political. So the Sudan is not one. I don't know. I didn't check. I should have. So the answer to the question is, I guess, yes, the government's position is that people back to Darfur and the other portions of Sudan that are now involved in the horrendous activities going on there. Again, that's a political judgment for the Attorney General to make. I didn't ask whether it was a political judgment. I said, is that what the government's position is? It may be political. The government may make more than one terrible political judgment. But I was just asking you what it was. If TPS has not been granted, yes, that has to be the government's position. But, again, there are other remedies than asylum. But is that something this Petitioner could now take advantage of? If he has voluntary to get Sudan to be recognized, is it? No. No. But he can apply to extend his voluntary departure until things settle down. In his individual case, that is a decision that can be made at the individual level. And could this I.J. have done that instead?  The district director does that. So this person would then go back and apply for that instead? There are other remedies. But if he has, if he fears general conditions, that's not a basis for asylum. The question I had for you, is this similar to the situation that we've heard in Bank and Lolong involving Indonesia? Well. We haven't issued a decision yet, but this is sounding, the arguments are sounding quite familiar to the woman who claimed that it was not safe for her as a Christian to return to Indonesia because of the ongoing civil strife between Muslims and Christians and the Indonesian government's inability to control it. Well, I think it was even a little bit more specific that it's a disfavored group of Chinese, ethnic Chinese Christian women. Ethnic Christian women. Are a disfavored group. I don't think, I think every group, and it's a tragedy what's going on there, absolutely. But I think every group would be eligible for asylum if they could come here because everyone's killing everyone else. It's awful what's going on there. But. Well, I guess the question I have for both of you is if that issue is pending before the court in Bank, should we vacate submission on this case until the Lolong opinion comes down? I don't think it would be governed by Lolong because there it's a specific discreet ethnic group, ethnic and religious group. Whereas here he's just simply saying, I'm a, well, but he's saying I'm a black Christian. If I understand Mr. Frenden's argument. So he is like a Chinese Christian woman. I think again, because I think the situation is extremely different because there are so many subgroups at war with each other and his subgroup is not necessarily an innocent party. According to the State Department, everyone, you know, his subgroup, whatever group, his parents, his father was a member of, his father may have not engaged in persecution, but that group does. So he would have to do a lot more work to establish that he represents a disfavored group that is not tarred by the fact that. That's the SPLM, right? They're just as bad as the other side, whatever the other side is. Exactly. But they're composed of black Christians. But the argument I'm hearing Mr. Frenden make is he's a black Christian going back to a country that's in civil war and Christians of all sorts are dying more so perhaps in the north than in the south. And that's why he has a fear, a reasonable fear of future persecution. But not being singled out because people are dying on both sides. And black Christians aren't being specifically targeted. Everyone's a victim there. And again... Let me give you another problem that I'd like you to address with this report of the IJ. A lot of his determination is based on credibility. And he makes a credibility finding in favor of the Petitioner. He says, in some ways, having listened to the Respondent and as well compared his statement, I do find him to be credible. Then, at the end of his opinion, he says, it does appear the Court finds he is not sincere in his fear of persecution. Then it goes on to say he doesn't really have a fear of returning. He just wants to come to this country because this is such a wonderful place. How is that consistent with his credibility finding? Well, he's credible. He doesn't want to go back. He's credible when he says he fears going back. Well, yes, he fears going back. But that's what he just said. He's not. That's not what he is. But not for asylum purposes. He does not want to go back because he has a genuine fear of returning, but there's no objective evidence which establishes that it's on account of the statutorily protected ground. No, no. He doesn't say there's no objective evidence. He says that his fear is he is not sincere in his fear of persecution. You do know that there has to be a subjective fear of persecution. As well as an objective one. As well as objective. He says there is no subjective fear of persecution. Well, he probably should have said, again, these are oral decisions. They're not always perfectly artfully worded. I understand that, but we don't say when we review the decision, well, this is just an oral decision, so if there are errors of law in it, we're going to ignore them  This is not an error of law. He says he is not sincere in his fear of persecution as the basis of the asylum claim. He fears going back, but not on account of a statutorily protected ground, and that's what basis of his asylum claim means. That's what he means when he says that. And that's what you have when you say I have a subjective fear of returning for persecution. But it's not persecution. But he said he had a fear of persecution in the transcript, in his testimony. Once you say you're credible, you have to accept that testimony. He's credible that he fears going back. No, he feared persecution. He fears persecution, but not as the judge found. His fear was not on account of the statutorily protected ground, so it's not, it cannot be the basis of an asylum claim. So when he testified, I fear persecution, if I go back, you've got to say I fear persecution on account of the statutorily protected ground. No, no. But it's not a basis for an asylum claim unless it is on account of the statutorily protected ground. And that's what the judge is saying. And his grounds weren't that he was a black Christian? Yes, but what the judge found is that it's a fear of internal turmoil and countrywide warfare, one side against the other. Everyone is at risk. Everyone is at harm. He is not at particular harm. Are you relying for anything in your brief on the possibility that the father and brothers were persecutors? You mentioned that, but it's not clear to me why. Is there something you're citing that point for? Oh, because they were members of an organization that engages in acts of persecution. And does that affect this Petitioner in some way? Only if there's a nexus and he hasn't established the nexus. You're saying if he does establish a nexus, then it's a bad nexus because you think his father and brothers may have been persecutors? Not necessarily. But then if he establishes a nexus, then, and he's not a persecutor, an opinion might be imputed to him because of the acts of his father and brothers 30 years ago. But he hasn't established that nexus, that either they were killed on account of that and that he would be connected with them at the time or 30 years later. And if I may add one more thing, Mr. Frenzen's other error is he says, keeps saying that substantial evidence supports, and that's true, but all substantial evidence is what governs the Board's decision. Substantial evidence must support it, but the evidence must compel a contrary conclusion in order to warrant reversal by this Court. What about his argument that the government, it's the government that has the burden of establishing the reasonable safety of the area that he is to relocate to? He's wrong. That's only when there's past persecution. Okay. So that presumption, that burden doesn't shift until we conclude that there was past persecution sufficient to establish the presumption. Yes, Your Honor. But at that point, then, you would concede that it's the government's burden to show that relocation to the south would be reasonable. Yes. And I think he's done that, because the south – well, Forder, the situation there is awful, and perhaps I should suggest to the Attorney General that he considered TPS for Sudan. You're right, it should be considered, and anyone can raise that to the Attorney General, and I hope he's considering it. But it doesn't mean that everyone who comes here – and the other thing is, he's been wandering the world for 30 years, and there are other places he could have asked for asylum. He's not fleeing persecution. 30 years? When did he start wandering the world? Well, he left home in 1975. He left his hometown in 1975. He left home in 1975? He left Khartoum in 1985. So he's been wandering the world for 20 years. And so you cannot say he's fleeing persecution. He has not been in Sudan for 20 years, more than 20 years. And as the immigration judge found, there were other places he could have sought asylum, or some other of those places. Do we know whether those places have such a thing? I'm sorry? Do we know whether those places have such a thing? Yes, they do. No, they don't. The first place he went almost all the time was Lebanon. Almost all the time. Right. Then he went to Syria for a couple of months. A couple of days, I think. Days. And then he went to a couple of other places for a couple of months. He was a few months in El Salvador, which gives asylum. And actually, I've read articles where a lot of Americans retire there because the beaches are beautiful and the war is over and it's very cheap to live there. And then he heard that, oh, you could do better in Guatemala. So he spent a couple of months in Guatemala, and then somebody said he could do better in the United States. And is that a legal argument, that he's not entitled to asylum? No. No. But it means that he's not fleeing persecution if he's looking for a ---- But it doesn't affect his entitlement to asylum. No. It doesn't affect his eligibility, but it's one of the factors to consider in assessing his eligibility. All right. And you mean he could be held not eligible because he spent two months in El Salvador and two and three in Guatemala? No. It's not a disqualifying factor. It's a factor to consider. But it could be based on that? No. Not alone, but it's a factor to consider. Is he fleeing persecution? Is he fleeing in fear of his life? And clearly, in this case, he's not. That is a factor to consider. Are there no further questions, Your Honors? Thank you. No, but could you tell me what case says you should consider the ---- I beg your pardon? Can you tell me what case it is that says you can consider his spending a couple of months somewhere else? I will bring that to you. I can't think of the case right now, but I know there is case law on that. Thank you. Thank you, Your Honor. I'm glad I only made three fatal mistakes. I was counting. And they seem to be more than three. In regard to Judge Reinhardt's question to Ms. Schwartz here, I can tell you, Your Honor, the case that does not stand for the proposition that Mr. Daniel should ---- the fact that he traveled to these other countries should be held against him. This Court, in Demise Jobe in 1986, has held that the proper inquiry is not necessarily the reasons for which an asylum seeker left his country, but the proper inquiry is why the asylum seeker is fearful of returning to his country today. And that is the situation on which Mr. Daniel's claim is based. When we had our hearing in front of the Immigration Court here in Los Angeles in 2002, I believe it was, the question was, why did Mr. Daniel fear returning to Sudan as of that time? That's what's before this Court. He fears returning primarily because he's a black Christian. Well, it does have to be on one of the five protected grounds. You concede that Ms. Schwartz is right on that. Absolutely. Absolutely. Then the question becomes, how do we interpret the wording on pages 9 and 10 of the Immigration Judge's decision in which Judge Reinhardt was asking Ms. Schwartz  on one of the five recognized grounds? And I guess your argument is it has to be on the grounds of religion, right? Not really show imputed political opinion because of the absence of evidence in the record to show why his brothers and father were killed. I agree with that. His claim is based upon religion. And his ethnicity, being an African. But his primary claim is based upon his race, his religion, rather. Ms. Schwartz also talked extensively about this situation of general civil strife or random violence. And again, the government is correct, and we should lose if all that the petitioner fears is random violence upon return to Sudan. He does not fear random violence. The evidence in the record does not suggest that Christians are the result, are being targeted as a result of random violence. The evidence compels the conclusion that black Christians are being targeted. The fact that there are massive human rights violations in a country does not, that are targeted human rights violations based upon race or religion or political opinion, does not turn the case into a general conditions case. And Your Honors, one or more of you have raised Darfur. Let's apply this to a hypothetical situation of someone claiming asylum from Darfur. The fact that your resident of Darfur is fleeing massive violations directed at most of the inhabitants of Darfur because of their race does not turn that into a general conditions case. If Daniel faced, if his situation was identical to that of all Sudanese, regardless of ethnicity, regardless of race, and all Sudanese were equally being harmed during a, as a result of civil strife, then we would not have a case. He's being, he's being targeted. So what's your answer to my low-long question? I, I, I am not familiar enough with the issues, so I, I don't have an opinion. Okay. I'm over my time. Thank you. Thank you. Thank you. Thank you, Chairman.  Thank you Chairman.
judges: Reinhardt, Tallman, Wilken